No. 25,791.

JULIUS J. FENN, *Appellee*, v. THE KANSAS GAS & ELECTRIC COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE — *Injuries to Person — Evidence Sufficient Against Demurrer.* In an action for damages for injuries sustained by a pedestrian in being run over by an auto truck at an intersection of a sidewalk and an alley, the evidence examined and held sufficient to maintain the action against a demurrer thereto.

2. SAME—*Verdict Not Excessive.* The injuries sustained by plaintiff through defendant's negligence considered, and *held,* that the verdict and judgment are not so manifestly excessive as to justify this court in ordering a remittitur or a new trial.

3. TRIAL—*Special Findings.* The jury's special findings were not inconsistent, and the trial court committed no error in refusing to set them aside.

4. EVIDENCE—*Weight of Testimony Not Contradicted.* Rule followed that the triers of the facts are not bound to believe the testimony given on behalf of a litigant, even in the absence of express contradiction or rebuttal.

5. JUDGMENT—*Special Findings.* Defendant's motion for judgment on the special findings was properly denied.

6. TRIAL—*Instruction to Jury—Applicability.* Assuming that the doctrine of "last clear chance" was not involved in the action, the trial court's instruction thereon was not an incorrect statement of the law, and the giving of the instruction was not prejudicial to defendant.

Appeal from Reno district court; WILLIAM G. FAIRCHILD, judge. Opinion filed March 7, 1925. Affirmed.

*C. G. Yankey, W. E. Holmes, D. W. Eaton,* and *John L. Gleason,* all of Wichita, for the appellant.

*J. S. Simmons, Stuart Simmons,* and *Alva L. Fenn,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages for injuries sustained by plaintiff, who was knocked down and run over by an auto truck driven by defendant's employee.

The facts briefly stated were these: Plaintiff was a mail carrier in Hutchinson. He was walking westward on the sidewalk on the north side of Sherman street. As he was crossing an alley running north out of Sherman street which intersected the sidewalk, a Ford truck driven by defendant's employee, and headed northward into the alley, struck, knocked down and badly injured the plaintiff.

Defendant's answer traversed the allegations of plaintiff's petition and pleaded contributory negligence. Jury trial; special findings, general verdict and judgment for plaintiff; appeal.

Defendant urges that its demurrer to plaintiff's evidence should have been sustained; that the verdict was excessive; that the special findings were inconsistent and certain of them should have been set aside; that judgment should have been rendered for defendant on the special findings, and that there was error in the instructions.

Touching these in order, the evidence for the plaintiff tended to show that the accident occurred as he was hurrying westward on the sidewalk on the north side of Sherman street with a sack of mail on his left shoulder, and just after he has passed the middle line of the alley running north and south and intersecting the sidewalk. The defendant's auto truck, which had been backed up against the curb on the north side of Sherman street, had been started out into the street and backed into the alley on the south side of the street, and had then been driven northward out of the alley on the south side of Sherman street and steered northeastward on Sherman street to avoid a collision with an eastbound automobile, and then swung northwestward, headed for the alley running north out of Sherman street, and to avoid colliding with a bank building on the west side of the alley the truck was then steered northward on the west half of the alley as it crossed the sidewalk, at which point it struck, knocked down and injured the plaintiff. A witness testified:

"I saw the truck that injured him. I was going east on Sherman street driving a Studebaker car. A Ford truck came out of the alley going north, and it swayed out a little to miss me. I applied the brakes and he didn't hit me. It swung out a little and then back to the west side of the alley, and I saw him go in the alley across the street next to the building right back of the bank close to the alley. I had come to a dead stop and hadn't started my car, and then I heard this man shout and I looked over there just in time to see the hind wheel run over him. I think the truck was running about ten miles an hour. The truck entered the alley on the west side. I saw Fenn fall. I don't know what part of the truck hit him. I turned just in time to see the hind wheel run over him. The truck ran about half of its length after it struck him. As I remember, the truck was headed to the north at the time of the accident. I don't know who it was that shouted. I didn't hear any warning of the truck approaching. I didn't hear a horn blow. I doubt if I would have heard it if it had been blown. The truck after it stopped was setting in the alley just past the intersection. It wasn't out in the street. It was on the west side of the alley."

On cross-examination this witness said the truck was probably not running ten miles an hour when it struck the plaintiff, but another witness estimated its speed at ten miles an hour, and yet another witness judged that it was running between six and ten miles an hour.

While defendant makes a specious argument that the truck driver specially exerted himself to avoid injuring the plaintiff, steering his truck toward the west side of the alley for that purpose, the jury had good reason for giving an altogether different interpretation to such circumstance. It was fairly deducible that the driver had been negligent in the way he steered the truck across the street, and that he was negligent in driving so fast and in attempting to enter the alley in a northwesterly course, and that his striking the plaintiff was merely one result of a belated effort to avoid colliding with the corner of the bank building on the west side of the alley. We do not say this was the fact; we merely say that from all the evidence the jury could justly infer that such was the fact. Defendant's demurrer to the evidence was properly overruled.

It is next urged that the verdict was excessive. It was for $5,000. Plaintiff suffered a comminuted fracture of the femur. This required complicated surgical treatment. A hole was made in the soft tissues of his leg and a "caliper" clamped into the bone, and kept there two or three weeks. Meantime the leg was held to its proper length and to its proper shape by weights and pulleys, and after the "caliper" was removed the leg was placed in a plaster

cast for four or five weeks. The suffering was great. He was injured on April 12, 1923. As late as August 1 his leg was not yet restored, and his knee particularly bothered him. There was a shock to his nervous system. His leg was still weak when this action was tried. Plaintiff had to rest his leg and shift his weight from it. His employment in the postal service had to be changed from that of a mail carrier working from 8 a. m. to 5 p. m. to that of a mail distributor working from midnight until 5 a. m., and then three hours after breakfast. Plaintiff was still nervous and his leg sometimes bothered him in his sleep. His leg pains him in damp, cold and chilly weather. The government paid his doctor's bills, $240, but merely as a loan, which plaintiff has to repay. The physician and surgeon who attended plaintiff testified that there had been a good union, that plaintiff's nervous disorder would disappear, that the leg eventually would become as strong as ever, and his injury would leave no lasting effect.

It is on this sort of testimony that we are asked to hold that the verdict of $5,000 was excessive. As we have often said, an excessive verdict and judgment is one of the most difficult problems which an appellate court has to deal with, as there is no uniform standard which can be used to measure the adequacy of verdicts for bodily injuries, including past, present and future pain and suffering; so it has come about that unless the award is so great as to shock the conscience of the reviewing court the verdict and judgment will not be modified or set aside. (*Harper v. Railway Co.*, 95 Kan. 201, 205, 147 Pac. 1106; *Truman v. Railroad Co.*, 98 Kan. 761, 766, 161 Pac. 587; *Griffith v. Railroad Co.*, 100 Kan. 500, 510, 164 Pac. 467; *Watson v. Parker Township*, 113 Kan. 130, 136, 213 Pac. 1051; *Bollinger v. Railway Co.*, 114 Kan. 669, 220 Pac. 274.)

In *Hardwick v. Railways Co.*, 114 Kan. 843, 845, 220 Pac. 1043, it was said:

"Error based on an excessive verdict and judgment is seldom an easy question for an appellate court to solve, and it is peculiarly difficult where the sum allowed is for pain and suffering. Of course rules for dealing with excessive verdicts are not altogether wanting; if on reading the record the conscience of the court is shocked at the verdict, a remittitur or reversal is ordered; but there is no uniform yardstick, no hard and fast rule, by which the excessiveness of a verdict can be measured and determined as in ordinary mathematical calculations. In this case, when we give full credence to the plaintiff's testimony touching his pain and suffering, as we are bound to do because the jury gave it such credence, the verdict and judgment are not so large as to produce

such psychological reaction on the judicial conscience as to impel it to order a reduction or reversal."

See, also, *Bracken v. Champlin,* 114 Kan. 882, 220 Pac. 1027, and cases therein cited, where the verdict was set aside as inadequate; and the cases of *Aaron v. Telephone Co.,* 89 Kan. 186, 131 Pac. 582; *Carl, Administratrix, v. Ackard,* 114 Kan. 640, 220 Pac. 515; and *Stone v. City of Pleasanton,* 115 Kan. 378, 223 Pac. 312, where verdicts were held to be excessive.

In the present case, in view of the testimony, this court cannot say that the verdict is excessive, so as to warrant a disturbance of the judgment on that account.

It is next argued that certain of the jury's special findings were inconsistent and should have been set aside. The material findings read:

"Q. No. 1. If Fenn had looked in the direction from which the truck was approaching, could he have seen the truck at all times after he passed the office door of the defendant? A. Do not know.. . . .

"Q. No. 5. At the time Fenn reached the east line of the alley, where was the truck? A. Between gutter line and center Sherman street. . . .

"Q. No. 7. Could Fenn have stopped in one step at any time after he passed the door of the office of defendant? A. Yes.

"Q. No. 8. When did the driver of the truck first discover that Fenn was in danger of colliding with the truck? A. When he first saw Fenn.

"Q. No. 9. After the driver of the truck discovered that Fenn was not going to stop, what did the driver do to avoid the collision? A. Nothing until too late.

"Q. No. 10. How far did Fenn travel after the driver of the truck discovered that he was in danger of colliding with the truck? A. We do not know."

Defendant complains of the answer to question No. 1, and quotes some testimony which would have justified an affirmative answer to that question. But there was ample testimony to show that the truck did not come squarely across plaintiff's line of travel, but approached from a southeasterly to a northwesterly direction, which may have been the reason plaintiff did not see its approach. As the plaintiff's testimony bears upon several of the criticized findings, it seems necessary to reproduce it at some length:

"I traveled that block between the post office and Main street in Hutchinson every morning, and I was perfectly familiar with it. I know just where this alley was located in that block. It is a much-traveled alley, and I knew that at the time. . . . I had a heavy load of mail that morning. I don't know whether I had anything in my right hand or not. The Saturday Evening Posts I carried were flat in a bundle, with a strap around them. There were probably eighteen or twenty of them and I don't remember whether I

had them on top of my pouch or whether I was carrying them in my hand. I had a strap of mail, papers and letters, which I stuck up beside my head. I divided my mail and tied it up and let it lay on top of the sack. It was not possible with the mail pouch in the position I was carrying it for me to look to my left without turning my body so I could look around that mail pouch. . . . I was walking at my customary gait. I am naturally a fast walker. I continued at that gait until I got in front of the gas office (immediately east of the alley), and then I kind of.hesitated and looked. I looked to the right and to the left, and then I started straight ahead. I cannot tell how many steps I took after I stopped and looked until I was struck. . . . There was nothing that I know of beside that pouch of mail that would have prevented me from seeing a vehicle approaching the alley intersection from either direction. There are no telegraph poles or anything of that sort there. If there had been a Ford truck approaching that alley intersection from the south and within ten or fifteen feet of the place where the sidewalk crosses I undoubtedly could have seen it with the look I gave. The first I knew there was a truck there was when I was struck. . . . The only thing I know was I heard somebody holler 'look out,' and at that instant I was struck. Of course I naturally turned to get out of the way of it. . . . I turned to the right to face up the alley instead of out in the street, thinking possibly I could prevent an accident. I couldn't tell where the shout came from. I did that turning before this truck struck me. The turning brought the mail pouch closer to the truck than it otherwise would have. The truck was angling to the northwest. . . . My mail sacks are usually very heavy. I had a heavy load. . . . I couldn't say how many steps I took after I heard somebody shout. I couldn't say that I took any. I heard this man shout when I was about half way across the alley. . . . I do know that the part of the truck which struck me was about the middle of the truck from the front to the back, and that the rear wheel of the truck is the only wheel of the truck that ran over me."

Defendant relies on its driver's testimony to demonstrate that the jury's answer to question No. 8 was incorrect. One trouble with this and other features of defendant's argument is the assumption that what its witnesses testified to must be accepted by this court as true, which, of course, is altogether incorrect. (*Cobe v. Coughlin,* 83 Kan. 522, 112 Pac. 115; *Fisk v. Neptune,* 96 Kan. 16, 149 Pac. 692; *Wyrick v. Street Railway Co.,* 100 Kan. 122, 129, 130, 163 Pac. 1059; *The State, ex rel., v.·Woods,* 102 Kan. 499, 170 Pac. 986; *The State v. Luft,* 104 Kan. 353, 179 Pac. 553.) In *Swartz v. Levin,* 108 Kan. 224, 194 Pac. 646, where it was urged that because certain testimony of defendants was not contradicted it should be considered as establishing the facts, this court held that the trier of the facts· was not bound to believe the defendants' evidence even in the absence of express contradiction on rebuttal. The court added:

"The trial court may have distrusted the veracity of the witnesses from something in their manner or from a suspicion growing out of the way in which the transaction had been conducted on the part of the defendants. At any rate, as the court was not persuaded by the evidence of the party on whom the burden of proof upon this issue rested, there was no occasion for requiring any rebuttal."

Stress is laid on the jury's answer to question No. 7, but it is not entitled to the significance defendant would attach to it. It is perhaps generally true, when a person is run down by a vehicle, that a step or two less would have saved him from that particular accident or an additional step or two would have carried him beyond the danger line. Nor can it be conceded that the answer to question No. 9 is out of harmony with the evidential facts which the jury chose to adopt as true. Moreover, it is clearly a fallacy to argue that the measure of the driver's responsibility was merely to make an effort to avoid injuring plaintiff after he realized the danger of running him down. The driver's duty and responsibility began before the moment he realized the danger of hitting the plaintiff. It began at some reasonable interval of time prior to that critical moment. But for the driver's negligence in driving the car, in the course and at the speed he did drive it, the danger to plaintiff would not have arisen; it was that negligence which created the danger of injuring the plaintiff; and neither he nor his employer can be excused from liability merely because after a belated realization of that danger, he then did everything possible to prevent the consequence his prior negligence had already rendered almost or altogether unavoidable. It is contended that assuming the truck driver's negligence to have been established, the jury's findings that plaintiff could have avoided the accident by not taking the last one step which he did take constituted negligence on the part of plaintiff as a matter of law. This reasoning presupposes that Fenn realized his danger and the direction from which it was approaching and that he had time to consider how the danger could be avoided and to act accordingly. From the plaintiff's testimony quoted above it is clear that no such situation arose; and defendant's motion to set aside findings 8 and 9 was properly denied. (*Williams v. Benson,* 87 Kan. 421, 124 Pac. 531; *Cusick v. Miller,* 102 Kan. 663, 171 Pac. 599; *Kinear v. Guthrie,* 113 Kan. 692, 216 Pac. 280.)

Yet another error is urged in denying defendant's motion for judgment on the special findings, particularly 5 and 7. It is argued

from these that plaintiff's contributory negligence was established. The contention lacks merit and requires no discussion. (See *Hornbuckle v. McCarty*, 295 Mo. 162, 25 A. L. R. 1508, 1513, *et seq.*; *Mosso v. E. H. Stanton Co.*, 75 Wash. 220, L. R. A. 1916A, 943.)

Defendant's last and most curious complaint relates to an instruction which the trial court gave to the jury involving the "last clear chance" doctrine. Defendant does not complain of the trial court's statement of the doctrine, but of "the submission to the jury of this case under the humanitarian doctrine" involved therein. This court might agree with defendant that there was no occasion for giving this instruction, but it would be for a very different reason from that urged by defendant. Our reason would be that the evidence of plaintiff's negligence was so shadowy that it never became a *bona fide* factor in this lawsuit, and that it was unnecessary to encumber the instructions with any statement of the doctrine at all, but certainly its giving was not to the prejudice of defendant.

The other matters urged on our attention, and which run through the entire course of the argument of counsel for defendant, have not been overlooked. Indeed, the argument throughout is unusually clever; but it is mostly a jury argument, and fails to indicate one plain, palpable error of sufficient gravity to justify this court in disturbing the judgment.

Affirmed.